**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**CASE NO.** _____

MARY BETH HEINERT and RICHARD H.
SCHULTZ, JR. on behalf of themselves and all
others similarly situated,

       Plaintiffs,

v.

BANK OF AMERICA, N.A., CITIZENS BANK,
N.A., PERRY SANTILLO, CHRISTOPHER
PARRIS, DOMINIC SIWIK, PAUL ANTHONY
LAROCCO, JOHN PICCARRETO, and
THOMAS BRENNER,

       Defendants.

_____/

**CLASS ACTION**

**JURY DEMAND**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Mary Beth Heinert and Richard H. Schultz, Jr., on behalf of themselves and all others similarly situated, sue Bank of America, N.A. ("Bank of America"), Citizens Bank, N.A. ("Citizens") (together, the "Banks"), Perry Santillo, Christopher Parris, Dominic Siwik, Paul Anthony LaRocco, John Piccarreto, and Thomas Brenner (together, the "Individual Defendants"), and state:

## INTRODUCTION

1.     This case arises from a nearly decade-long Ponzi scheme orchestrated by Perry Santillo, Christopher Parris, and Dominic Siwik, and run through more than one hundred accounts at Bank of America and approximately twenty accounts at Citizens. Santillo, Parris, and Siwik bought books of business from investment advisors in New York, Ohio, Florida, Texas, Pennsylvania, Indiana, Tennessee, Nevada, California, Maryland, Georgia, and South Carolina,

and with help from their accomplices, Brenner, Piccarreto, LaRocco, and others, they solicited approximately $102 million in investments from hundreds of the advisors' clients, mostly retirees.

2.      The investments were a sham.  The Individual Defendants solicited the bulk of the $102 million that they raised from investors through three issuer companies—First Nationle Solution, LLC ("First Nationle"), Percipience Global Corporation ("Percipience"), and United RL Capital Services, LLC, ("United RL")—but also used a variety of smaller companies to advance their scheme.  The fraudulent offering materials for the companies promoted lucrative investments in financial services, insurance, real estate development, and medical laboratories.  In fact, however, the Individual Defendants accepted investor funds and misdirected them to pay off earlier investors, fund a jet-setting lifestyle, and cover their personal expenses, which they often charged to Santillo's personal American Express Centurion card.  While the fraud was ongoing, Santillo even commissioned a song about himself and played it during a lavish party at a Las Vegas nightclub.  The lyrics call him "King Perry," describe him as wearing "ten thousand dollar suits everywhere he rides," and refer to him "pop[ping] champagne in L.A., New York to Florida; buy another bottle just to spray it all over ya."

3.      The Individual Defendants could not have executed their scheme undetected for so many years without the knowing and substantial assistance of their longstanding primary banking institution, Bank of America, and its successor to their accounts, Citizens.  The Individual Defendants opened their first accounts at Bank of America in 2005 because Parris had a preexisting social relationship with Derline Cunningham, the branch manager of the State Street branch in Rochester, New York.  Over time, Santillo also developed a close relationship with Cunningham, their primary contact at Bank of America, and later their primary contact at Citizens.  Cunningham quickly became a key player in their fraudulent scheme, expediting fund availability, lying to

creditors, and enabling the fraud to expand—all in her capacity as an employee of first Bank of America and later Citizens.

4.      Cunningham's knowing assistance, together with that of other Bank of America and Citizens employees, was critical to the Ponzi scheme's survival.  According to Santillo, based upon his interactions with Cunningham, she knew and understood that the Individual Defendants solicited investments from people around the country, deposited the investments into their various accounts at Bank of America, and then routinely shuttled money through the accounts, often with the funds ending up in the Individual Defendants' personal accounts and then being removed through cash withdrawals or as personal checks written from the Individual Defendants' accounts. Santillo also explained that Cunningham was entirely at their disposal. As he described the relationship, Cunningham "would have danced naked in the street in winter if I asked."

5.      During the approximately eight years when the Individual Defendants ran their scheme through Bank of America, Cunningham directed and coordinated the opening of more than one hundred accounts for the Individual Defendants and their various investment vehicles—which were all held out to investors as independently operating businesses—among which Bank of America freely transferred investor funds without regard for investors' intentions.  She opened some of these accounts without first obtaining signatures from Perry Santillo, despite the accounts often being in his name.

6.      Bank of America also executed large transfers of funds which moved rapidly in and out of accounts with low, zero, or negative balances.  It further executed transfers from rental escrow accounts to other, non-fiduciary accounts.  When the Individual Defendants sought to deposit large investor checks into their Bank of America accounts and needed immediate access to the funds to keep the Ponzi scheme afloat, Cunningham would lift the standard, multi-day holds,

and clear the checks upon presentation.  Finally, at Santillo's request, Cunningham, on behalf of Bank of America (and later Citizens) placed quarterly calls to American Express, which credited the Individual Defendants hundreds of thousands of dollars monthly to float this scheme, to falsely confirm that Santillo's bank accounts held sufficient funds to cover his outstanding debts, when, in fact, these accounts carried low, zero, or negative balances—and Cunningham knew it.  But for Cunningham's lies, Defendants' credit line would have evaporated and the scheme would have collapsed.

7.    The frequent atypical transactions among the Individual Defendants' many accounts were clear indicators of fraudulent conduct, which accordingly triggered inquiries and investigations into the accounts and the Individual Defendants' businesses.  Bank of America representatives questioned the Individual Defendants in connection with these inquiries, but never suspended or closed the accounts, allowing the Individual Defendants uninterrupted use of its banking services.  Many, if not all, of the inquiries at Bank of America were conducted by Vice President and Relationship Manager Eric Allen, with whom Santillo and Parris had worked at New York Life Investment Management and whom they had known for more than a decade.

8.    When Cunningham left her position at Bank of America in 2016, she asked the Individual Defendants to follow her to Citizens, and transfer their accounts to Citizens under her management.  The Individual Defendants agreed without hesitation, knowing that without Cunningham's assistance, their fraud would collapse.  At Citizens, Cunningham opened approximately twenty accounts for the Individual Defendants and the vehicles for their fraudulent scheme.  As she had done at Bank of America, Cunningham continued to lift holds on large deposits, to falsely vouch for the accounts to American Express, and to routinely process atypical transactions.

4

9.      Shortly after the Individual Defendants moved their accounts to Citizens, Cunningham requested that Santillo and Parris "loan" her approximately $40,000, and stopped responding to their instructions to lie to American Express until payment was made.  Once Parris and Santillo paid Cunningham the sum she had requested, she immediately resumed her participation in their fraudulent scheme.  The "loans" were not recorded, no terms—even repayment terms—were discussed, there was no written loan agreement, no stated interest rate, and Cunningham never repaid Santillo.  According to Santillo, he understood Cunningham's request for a "loan" to be a *quid pro quo* demand, to which he acceded in order to maintain her complicity and vital assistance.

10.     The SEC conducted an investigation of the fraud, which resulted in a civil enforcement action styled *SEC v. Santillo, et al.*, No. 18-CV-05491-JGK (S.D.N.Y.), filed on June 19, 2018.  The SEC action charges Santillo, Parris, Piccarreto, LaRocco, and Brenner with misappropriating funds and using them to pay redeeming investors "in classic Ponzi-scheme fashion." On June 22, 2018, the Court in the SEC action entered an Order to Show Cause and Temporary Restraining Order Freezing these Defendants' Assets.  *See SEC v. Santillo*, D.E. 6.

11.     Plaintiffs bring this action on behalf of a proposed class of the approximately 637 investors who were victims of the Individual Defendants' Ponzi scheme.  Plaintiffs bring fraud, breach of fiduciary duty, and conspiracy claims against the scheme's architects, Santillo, Parris, and Siwik, as well as their accomplices, Piccarreto, LaRocco, and Brenner; and claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and conspiracy against Bank of

America and Citizens, the two financial institutions without whose knowing and substantial assistance the fraud could not have succeeded.[1]

## PARTIES AND RELEVANT NONPARTIES

### The Parties

Plaintiffs

12.    Plaintiff Mary Beth Heinert is a natural person over the age of 21 and is otherwise *sui juris*.  Mrs. Heinert is a citizen of the State of Florida.

13.    Richard H. Schultz, Jr. ("Mr. Schultz, Jr.") is natural person over the age of 21 and is otherwise *sui juris*.  Mr. Schultz, Jr. is a citizen of the State of Florida.

14.    Mrs. Heinert and Mr. Schultz, Jr., are the daughter and son of Richard H. Schultz ("Mr. Schultz") who passed away in Ocala, Florida, in May 2016 at the age of 85.  Between September 2012 and February 2015, Mr. Schultz invested approximately $263,430 in promissory notes issued by First Nationle Solution and approximately $250,000 in membership interests issued by Percipience Global Corporation.  Following Mr. Schultz's death, Mrs. Heinert and Mr. Schultz, Jr. each inherited one-half of these investments, and each was damaged by the Defendants' conduct described herein.

15.    Mrs. Heinert also invested $450,000 of her own funds in membership interests in United RL between July of 2016 and September of 2016, and was further damaged because of the Defendants' conduct described herein.

---

[1]  Plaintiffs filed these claims against Bank of America, Santillo, Parris, Brenner, LaRocco, and Picarreto in the Middle District of Florida on June 25, 2018.  *See Heinert v. Bank of Am.*, No. 5:18-cv-324 (M.D. Fla.).  Plaintiffs amended the original complaint in that action once as of right, and voluntarily dismissed the action on November 30, 2018.  *See id.* [D.E. 63].

Defendants

16.    **Bank of America, N.A.** is a federally chartered, multinational financial services company headquartered in Charlotte, North Carolina.  Bank of America knowingly structured a network of at least one hundred Bank of America accounts to advance the Ponzi scheme.  The Individual Defendants transferred their funds out of these accounts when their primary contact at Bank of America, Branch Manager Derline Cunningham, left her position there to accept employment at Citizens.

17.    **Citizens Bank, N.A.**, is a bank headquartered in Providence, Rhode Island, and operating in Connecticut, Delaware, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, and Vermont.  Citizens helped Santillo and Parris structure a network of approximately twenty accounts at a Rochester, New York branch of Citizens after Derline Cunningham accepted a position there as branch manager.

18.    **Perry Santillo** is a resident of Rochester, New York.  He founded First Nationle and acted as its CEO.  Santillo offered investment opportunities in First Nationle, Percipience, and United RL.  Santillo solicited investors to invest in various entities involved in the scheme.  He provided investment advice to investors and potential investors in these entities.

19.    **Christopher Parris** is a resident of Rochester, New York.  He managed First Nationle, founded and owned Percipience, owned United RL, and owned Ocala Investment Services (*see infra* ¶ 126).  Parris offered investment opportunities in First Nationle, Percipience, and United RL.  Parris solicited investors to invest in various entities involved in the scheme.  He provided investment advice to investors and potential investors in these entities.

20.    **Dominic Siwik** is a resident of South Lyon, Michigan.  He orchestrated the Ponzi scheme with Santillo and Parris, and managed Percipience and some of the smaller Ponzi scheme

entities, including Genvest and Next Medical Solutions.  Siwik solicited investors to invest in various entities involved in the scheme.  On information and belief, Siwik provided investment advice to investors and potential investors in these entities.

21.    **Thomas Brenner** is a resident of Orrville, Ohio.  Brenner offered investment opportunities in Percipience and United RL through his investment management firms in Ohio.  Brenner solicited investors to invest in various entities involved in the scheme.  He provided investment advice to investors and potential investors in these entities.

22.    **Paul Anthony LaRocco** is a resident of Ocala, Florida.  He founded, managed, and acted as CEO of United RL.  He offered investment opportunities in First Nationle, Percipience, and United RL.  LaRocco solicited investors to invest in various entities involved in the scheme.  He provided investment advice to investors and potential investors in these entities.

23.    **John Piccarreto** is a resident of San Antonio, Texas.  Piccarreto offered investment opportunities in First Nationle, Percipience, and United RL.  Piccarreto solicited investors to invest in various entities involved in the scheme.  He provided investment advice to investors and potential investors in these entities.

### Relevant Nonparties

24.    **First Nationle Solution, LLC**, is a Michigan corporation with its primary place of business in Rochester, New York.  It purported to conduct business in acquiring, selling, and improving commercial and residential real estate.  However, First Nationle actually operated as a vehicle for the Individual Defendants' Ponzi scheme.

25.    First Nationle issued promissory notes, solicited investor funds, misappropriated much of the solicited investor funds, and used the remaining funds to pay redeeming investors.

Santillo, Parris, Siwik, LaRocco, Piccarreto, and potentially others, have induced at least 318 people to invest at least $46 million in First Nationle since 2012.

26.    **Percipience Global Corporation** is a Delaware corporation.  It purported to purchase and improve single-family homes, and then hold, lease, or resell the properties for profit. In reality, Percipience operated as a vehicle for the Individual Defendants' Ponzi scheme.

27.    Percipience offered investors preferred stock.  Class A shares had a one-year "lock period" and a claimed annual return of 7%.  Class B shares had a three-year "lock period" and a claimed annual return of 8% with an 8% bonus upon initial investment.  However, many investors never received a return on their investments because Percipience primarily operated as a Ponzi scheme.  Santillo, Parris, Siwik, Piccarreto, Brenner, and potentially others, induced at least 229 people to invest at least $22 million in Percipience since 2012.

28.    **United RL Capital Services, LLC**, is a Michigan company.  It purported to make loans to medical practices for the purpose of owning their own laboratories.  As with Percipience and First Nationle, United RL was a vehicle for the Ponzi scheme.

29.    United RL offered promissory notes with maturity dates of either one year or three years.  Each type of note claimed that 7% interest payments would be paid semi-annually, and the three-year plan included a 7% bonus upon initial investment.  However, many investors never received a return on their investments because United RL primarily operated as a Ponzi scheme, like First Nationle and Percipience.  Santillo, Parris, Piccarreto, Brenner, Siwik, and others, have induced at least 183 people to invest at least $25 million in United RL since 2015.

30.    Santillo, Parris, Piccarreto, LaRocco, Brenner, and potentially others, also sold investments in smaller offerings under the same fraudulent scheme.  These schemes include, but are not limited to: (1) at least 41 people investing at least $3.2 million in Boyles America, LLC;

(2) at least 23 people investing at least $3.8 million in Middlebury Development Corporation; (3) at least 14 people investing at least $1.1 million in Lucian Development Corporation; and (4) at least 13 people investing at least $758,000 in Torr, LLC.

31.     **Derline Cunningham** was a branch manager at Bank of America and Citizens who served as the primary, day-to-day point of contact for the Individual Defendants beginning in 2005. The Individual Defendants initially told Ms. Cunningham that they were investment advisors, receiving money from individual investors and then investing those funds.  When Cunningham left Bank of America in 2016 and took a position at Citizens, she asked the Individual Defendants to transfer their accounts to Citizens so that she could continue to oversee the accounts.  Shortly after they established accounts at Citizens in 2016, Santillo and Parris made a $40,000 personal "loan" to Cunningham, at a time when they were having financial problems of their own.  Ms. Cunningham never repaid this "loan." Cunningham withheld some of her assistance to the scheme until the payment was made, and Santillo understood the payment to be a quid pro quo.

32.     **Eric Allen** is a Vice President and Relationship Manager in Commercial Banking at Bank of America.  Mr. Allen led inquiries into the Individual Defendants' business practices and accounts at Bank of America and, despite abundant atypical activity among the accounts, never suspended or closed the accounts, or otherwise curtailed the Individual Defendants' access to Bank of America's banking platform and the aura of legitimacy which it provided.  Perry Santillo and Christopher Parris had a preexisting relationship with Mr. Allen, whom they first met when they all worked together at New York Life Investment Management in 2003 and 2004.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (*codified in* 28 U.S.C. §§ 1332, 1453, 1711–1715).  Diversity exists among

the Plaintiffs and Defendants, there are hundreds of members of the putative Class, and the amount in controversy exceeds $5 million. 28 U.S.C. § 1332(d)(2). In determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative Class members are aggregated. 28 U.S.C. § 1332(d)(6).

34.    This Court has personal jurisdiction over Defendant Santillo because he is a New York citizen and resident. Defendant Christopher Parris was a New York citizen and resident at all times relevant to the allegations set forth herein, and, upon information and belief, remains a New York citizen and resident. This Court has jurisdiction over all of the Individual Defendants because they participated in tortious acts and a conspiracy committed in the Western District of New York. This Court has personal jurisdiction over Bank of America and Citizens because they participated in tortious acts committed in the Western District of New York, joined a conspiracy based in the Western District of New York, caused damage to investors in the Western District of New York as alleged herein, routinely and extensively conduct business in the Western District of New York, and otherwise have sufficient minimum contacts with the Western District of New York arising from the specific conduct committed in or directed to the Western District of New York alleged herein.

35.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred here, and all Defendants transact business, engaged in misconduct, or may be found in this District.

36.    All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### Background

37.    Perry Santillo and Christopher Parris worked together at New York Life Investment Management Services in the early 2000s.  In 2003 or 2004, they left and began to operate as the "Lucian Group," an independent investment brokerage in Rochester, New York.  Initially, they channeled their clients' investments into index annuities and other conservative, generally-available assets.  Beginning in around 2005, Lucian Group began using the Bank of America branch located on State Street in Rochester, New York, as its primary banking institution, as Parris had a pre-existing relationship with the branch manager, Derline Cunningham.

38.    Towards the end of 2005, Santillo and Parris met Ephren Taylor, who represented himself as an entrepreneur and money manager.  In fact, Taylor was running a complicated investment fraud scheme, into which Santillo and Parris invested.  In the summer of 2007, Taylor's scheme collapsed.[2]  Rather than declare their losses, Santillo and Parris acquired all of Taylor's assets and his business plan and attempted to turn Taylor's business into a legitimate enterprise. They were unable to do so

39.    As part of their business plan, Santillo and Parris created "Lucian Development," an entity designed solely to hold the limited assets and extensive liabilities they had acquired from Taylor.  Because the enterprise they had acquired was insolvent, Santillo and Parris were almost immediately required to supplement Lucian Development with funds from Lucian Group.  It was

---

[2] Taylor was not criminally charged for running this scheme, likely due to Santillo's and Parris's intercession.  In 2012, Taylor was arrested and charged with running a separate, unrelated fraudulent scheme, through which he had bilked millions of dollars out of investors.  Taylor is currently incarcerated and serving a nearly twenty-year sentence as a result of his guilty plea to that subsequent fraud.

at this point, in or around 2008, that Santillo's and Parris's investment advisory services began to operate as a Ponzi scheme. See *infra*, ¶¶ 44 *et seq*.

40.    Lucian Development was ostensibly a construction and development company. Santillo and Parris brought on Dominic Siwik—who had previously invested with and raised money for Ephren Taylor—to be their partner in the scheme. While Santillo focused on convincing investors to turn over their portfolios to the group, and Parris was responsible for identifying potential investments, Siwik was held out as the contractor—the person who would actually coordinate the construction associated with the developments.

41.    With the economic downturn resulting from the 2008 financial crisis, Santillo, Parris, and Siwik needed to continually identify and obtain new sources of revenue; that is, they needed to find new investors to feed their Ponzi scheme. Over the years, they created a number of front companies through which they could move investor funds. The first of these was First Nationle, which was incorporated in 2009.

42.    Around the same time, Santillo, Parris, and Siwik began to open a large number of bank accounts with Bank of America through Cunningham. These accounts were necessary in order to conceal the fraudulent nature of their business organization. As time went on, Santillo, Parris, and Siwik would open new, "clean" entities—front companies offering ostensible investment opportunities but, in reality, engaging in little or no actual business activities—into which they could direct investor funds. Genvest, United RL, and Next Medical Solutions, among others, were developed and marketed to investors. All of the vehicles were held out as independently-operating entities with separate and discrete business models. However, the Individual Defendants would, with the assistance of Bank of America and Citizens, wash money

through the accounts, withdrawing funds as they needed, without informing their victims of the ultimate uses and destination of their investments.

43.     In order to fund the scheme, Santillo and Parris also enlisted the help of Brenner and LaRocco, among others, who assisted Santillo, Parris, and Siwik with the development and operation of local investment advisory shops scattered around the country.  John Piccarreto, who is Santillo's cousin, was hired to assist as well.  According to Santillo, all of these advisers were well aware of the fraudulent nature of the scheme, the fact that investor funds were being circulated through the numerous accounts at Bank of America (and later Citizens), that previous investors were being paid from new investor deposits, that there was almost no legitimate investing taking place, and that the Individual Defendants were being enriched directly from the investor deposits.

**Overview of the Ponzi Scheme**

44.     According to Perry Santillo, the Individual Defendants operated a Ponzi scheme for almost a decade, ultimately defrauding approximately 637 investors across the country of more than $102 million.  All of the Individual Defendants were personally enriched as a result of the scheme, stealing millions of dollars of investment funds.[3]  Initially, as discussed above, Santillo and Parris devised the scheme using entities that they had founded as legitimate investment vehicles, primarily Lucian Group and Lucian Development.  In or around 2008, they began to transform these vehicles into purely fraudulent enterprises, and they created new vehicles to front their extensive fraud.  Siwik joined Santillo and Parris as an organizer and director of the Ponzi scheme at around that time.

---

[3]  For example, the Securities and Exchange Commission has estimated that Santillo alone misappropriated at least $13.4 million during this scheme.  *See Santillo*, No. 18-CV-05491-JGK [D.E. 1 at 12].

45.    As discussed in paragraph 43, *supra*, to advance their scheme, Perry, Santillo, and Siwik enlisted financial planners around the country to convince their pre-existing clients, who were mostly retirees, to invest in United RL, First Nationle, Percipience Global, and their other vehicles.   Brenner, LaRocco, and Piccarreto were accomplices to the fraud, and used their established ties in Ohio, Florida, and Texas, respectively, to help Santillo, Parris, and Siwik solicit additional investors.

46.    All told, Brenner's connections in Ohio allowed him and his co-conspirators to raise at least $8 million from at least 74 investors, since 2013; Piccarreto's connections in Texas allowed the Individual Defendants to raise at least $6.6 million from at least 38 investors since 2014; and LaRocco's Florida connections allowed the Individual Defendants to raise at least $26 million from at least 147 investors since 2012.

47.    The Individual Defendants extended the scope of their Ponzi scheme to other states, including, but not limited to, Pennsylvania, Nevada, Michigan, California, Georgia, North Carolina, South Carolina, Virginia, New Jersey, Massachusetts, Minnesota, Mississippi, Idaho, Indiana, Utah, Tennessee, West Virginia, Delaware, Maryland, Arkansas, and Arizona.   For example, Santillo and his associates defrauded at least 80 California investors of at least $21 million since 2012; 33 Pennsylvania investors of at least $3.5 million since 2015; and 24 Maryland investors of at least $2.2 million since late 2017.

**The Fraudulent Offering Materials**

48.    The promotional materials for First Nationle, Percipience Global, and United RL, among others, promoted the vehicles as legitimate and lucrative investments.   They were not.

49.    <u>First Nationle</u>: First Nationle's website, for example, states that it is "engaged in leveraging investments, holdings, and other assets, while building value for investors."[4]  The First Nationle website and brochures provided by the Individual Defendants to prospective investors claim that First Nationle is a holding company for "several sales affiliates that represent a group of companies who offer a rich portfolio of premier Insurance and Impaired risk products . . . These subsidiaries manage over $145 million in assets."  In fact, according to Santillo, First Nationle has never had any subsidiaries, much less subsidiaries with assets of $145 million.

50.    The First Nationle subscription agreement claims that it is "engaged in the business of senior market insurance program commerce and the development and management of diverse real property holdings."   It further provides that investments will "apply the proceeds of the offering to help fund the debtor's outlined business model" and that "[n]one of the proceeds of the Offering will inure to the personal benefit of the Manager."[5]  First Nationle's operating agreement identifies Santillo as the manager, while its subscription agreement states that Lucian Global, LCC is the manager.  Parris is the manager of Lucian Global LLC, and thus co-managed First Nationle with Santillo.

51.    Instead of "leveraging investments, holdings, and other assets," First Nationle provided promissory notes to investors that the Individual Defendants did not intend to honor.  The promissory notes purportedly matured after three years, and provided for interest payments at an annual rate ranging from 3.3% to 6%, as well as bonuses of approximately 10% to 19% upon an

---

[4] *See* http://www.firstnationlesolution.com/about.html (last accessed 1/17/19).

[5] *See* First Nationle Solution LLC Subscription Agreement, Exhibit 20 to Decl. of Dina Levy in Support of Plaintiff's Ex Parte Emergency Application for a Temporary Restraining Order, Asset Freeze, and Other Relief ("Levy Decl."), *Santillo*, No. 18-cv-05491-JGK [D.E. 4-20 at 18].

initial investment.  However, many investors never received any return on their investments, and any returns that were paid out were Ponzi payments rather than legitimate investment returns.

52.     Using these fraudulent offering materials, Santillo, Parris, Siwik, LaRocco, Piccarreto, and others, induced at least 318 investors to invest at least $46 million in First Nationle since 2012.

53.     Percipience: Percipience's private placement memorandum described its business as buying and improving single-family homes, and then leasing the properties for rent.[6]  It stated that, upon completion of a $5 million offering, it would use $4.25 million (or 85% of the proceeds) to make such purchases, with the remainder of the proceeds to be spent on expenses such as brokers' fees.  Percipience's operating agreement claimed that it "shall purchase . . . stand-alone homes or . . . flats within a multi-family building" and "lease residences to families supported by governmentally funded rent subsidies. . . ."[7]

54.     According to Santillo, Percipience conducted only minimal business functions for the sole purpose of creating the illusion of legitimacy.  In reality, Percipience offered investors sham stock investments with claimed annual returns of 7% or 8%, some with 8% bonuses upon initial investment.  However, many investors never received any return on their investments, and those returns that were paid were Ponzi payments derived from other investors' funds.

55.     Using these fraudulent offerings, Santillo, Parris, Siwik, Piccarreto, Brenner, and others, induced at least 229 people to invest at least $22 million in Percipience since 2012.

---

[6] *See* Percipience Global Corporation Private Placement Memorandum, Exhibit 7 to Levy Decl., *Santillo*, No. 18-cv-05491-JGK [D.E. 4-7].

[7] *See* Percipience LLC Operating Agreement, Exhibit 16 to Levy Decl., *Santillo*, No. 18-cv-05491-JGK [D.E. 4-16 at 1].

56.   <u>United RL</u>: The United RL brochure and memorandum claimed that its business was to make loans to physicians or medical practices for owning their own laboratories.[8]  Its website promoted United RL as "a singular-disciplined company that specializes in providing Physician's financing, supporting the initial development phases of Physician owned clinical laboratories."[9]  Its operating agreement stated that it engaged in "the direct or indirect (i) financing of medical-laboratory acquisitions and/or operations owned by third parties, and (ii) conduct of all commercial operations related thereto or supportive thereof."[10]

57.   According to Santillo, as with Percipience, United RL conducted only minimal business functions for the sole purpose of creating the illusion of legitimacy.  Instead, United RL offered promissory notes to investors with maturity dates of either one year or three years.  Each type of note promised 7% interest payments semi-annually, and the three-year plan offered a 7% bonus upon initial investment.  However, many investors never received any return on their investments, and those returns that were paid were Ponzi payments derived from other investors' funds.

58.   Santillo, Parris, Siwik, Piccarreto, Brenner, and potentially others, have used United RL offering materials to induce at least 183 people to invest at least $25 million since 2015.

**<u>The Misrepresentations, Misappropriations, and Breaches of Fiduciary Duty</u>**

59.   The Individual Defendants misrepresented that First Nationle, Percipience, United RL, and their other investment vehicles conducted the purported business of each respective issuer.

[8] *See* United RL brochure, Exhibit 13 to Levy Decl., *Santillo*, No. 18-cv-05491-JGK [D.E. 4-13].

[9] *See* United RL website screenshot, Exhibit 17 to Levy Decl., *Santillo*, No. 18-cv-05491-JGK [D.E. 4-17].

[10] *See* United RL Capital Services LLC Operating Agreement, Exhibit 8 to Levy Decl., *Santillo*, No. 18-cv-05491-JGK [D.E. 4-8].

After receiving investments, the Individual Defendants commingled the investors' funds and transferred those funds through multiple accounts under the Individual Defendants' control. Substantial portions of these funds were used to pay redeeming investors or to line the pockets of the Individual Defendants. In some cases, Santillo transferred nearly all of an investor's deposit to himself.

60.    The Individual Defendants also misrepresented the performance of the investments. They provided account statements to investors misrepresenting that their funds had been invested in the issuing companies. Other statements falsely stated returns and bonuses. In some cases, the Individual Defendants did provide investors with returns and bonus, but these were Ponzi payments derived from new investor funds. The Individual Defendants often failed to fulfill the requests of other investors who wished to redeem, routinely concocting false stories or excuses to delay or avoid providing owed, promised, or requested funds.

61.    Each of the Individual Defendants acted as an investment adviser, providing investment advice, purportedly in the investors' best interests, and each was compensated using misappropriated funds. Accordingly, each of the Individual Defendants had a fiduciary duty to the investors. The Individual Defendants breached their fiduciary duties to the investors when they failed to use investor funds as represented and by failing to put their customers' interests before their own.

62.    Of the at least $102 million raised by the Individual Defendants, approximately $38.5 million was paid to redeeming investors in Ponzi payments, at least $20 million was transferred to the Individual Defendants' bank accounts, and a large portion was transferred elsewhere in transactions that do not appear related to the purported businesses, including at least $3.9 million in credit card payments noting "Perry Santillo" in the payment information.

19

**Bank of America Facilitates the Fraudulent Scheme**

63.     Bank of America's knowing and substantial assistance was critical to the Individual Defendants' fraudulent scheme.  Santillo and Parris opened the first accounts at Bank of America's State Street Branch in Rochester, New York, in 2005, in connection with Lucian Group, the then-legitimate investment business that they ran together.  They came to Bank of America because Parris had a preexisting social relationship with State Street Branch Manager Derline Cunningham, who became their primary, day-to-day point of contact at Bank of America.

64.     As discussed in paragraphs 37–40, *supra*, when the financial market collapsed in 2008, Santillo and Parris began to convert Lucian Group and Lucian Development into illegitimate vehicles for their Ponzi scheme, and began to run fraudulent transactions through Bank of America accounts, which remained under Cunningham's supervision.  Santillo and Parris, together with Siwik, whom Santillo describes as the "third partner" beginning in 2008, then began to establish new vehicles for the fraud, starting with First Nationle in 2009.

65.     As the Ponzi scheme grew, Parris and Santillo had Cunningham open more and more accounts for their fraudulent enterprise.  Indeed, Cunningham and other State Street Branch personnel soon began to initiate account openings without first obtaining signatures from Santillo or Parris.  According to Santillo, Cunningham called him regularly to inquire if he wanted new accounts opened in his or his companies' names.  When he said yes, Cunningham would open the accounts (or have one of her supervisees open the accounts) without requiring Santillo to sign a signature card, even though he was identified as the signatory on the accounts.  Ultimately, Bank of America hosted more than 120 accounts for the Individual Defendants, including business accounts, personal accounts, and rental escrow accounts.

66.     Investor funds flowed through and among Bank of America accounts rapidly and without regard for the intention or understanding of the investor, the nature of the investment, or the type of account.  Upon receiving an investor's funds (which, in the case of investors outside Rochester, were mailed to Parris and Santillo for deposit), Parris, Santillo, or their assistant, Rozanne Vleck, would normally deposit the funds into a Bank of America account held in the name of Percipience or United RL, and eventually to one or more Bank of America accounts under the First Nationle name, where they were commingled with other investor funds.   These deposits would sometimes take place in person at the branch office Derline Cunningham managed, and would sometimes take place through wire transfers.

67.     Funds invested in Percipience usually went directly into one of its accounts at Bank of America.  Percipience's accounts at Bank of America would typically have balances of a few hundred dollars each, except when they would briefly be inflated by the deposit of investor funds, often in amounts greater than $100,000.  Within the same day or week, most or all of the investor funds would be transferred to another account at Bank of America in the name of a different company under the Individual Defendants' control.  These accounts would have small or zero balances, but Parris and Santillo would order transfer of the funds, almost immediately upon receiving them, to another affiliated account at Bank of America, to redeeming investors, or to one of the Individual Defendants' personal Bank of America accounts.

68.     United RL was created in 2015.  Beginning at that time, it routinely received deposits of investor funds, often in excess of $100,000, directly into a Bank of America account in its name.  On numerous occasions, normally within the same day or week, United RL would transfer all or most of these investor deposits into Middlebury Development's Bank of America account (the same account to which Percipience repeatedly transferred funds).   Once in

21

Middlebury Development's account, the funds typically moved from account to account within Bank of America's system in patterns similar to those described in paragraphs 66, 67, and 69.

69.     Funds invested in First Nationle usually weaved their way through the web of Bank of America accounts in the name of the Individual Defendants' smaller businesses before landing in one of First Nationle's accounts at Bank of America.  These funds often came from Bank of America accounts that had little or no balance before receiving an influx of investor funds.  Then, almost immediately, the funds were transferred to one of the Individual Defendants' personal accounts, another affiliated business, or First Nationle.  Once under the control of First Nationle, the funds would typically be redistributed to redeeming investors or to one of the Individual Defendants' personal accounts.  An example of a series of transactions from March 4, 2015, through March 6, 2015, illustrates this practice:

a.     Percipience's Bank of America account had a balance of $717.01 on March 3, 2015. It received $450,000 from investors over the next two days.

b.     Between March 4 and 6, $405,000 moved from the Percipience account to a Bank of America account previously containing $134 in the name of Middlebury Development, an affiliated business under the Individual Defendants.

c.     On March 5, $5,000 moved from Middlebury's account to Piccarreto's account, and $401,500 moved to the Bank of America account of Lucian Development, another company under the Individual Defendants' control and whose account had a previous balance of about $3,000.

d.     Also on March 5, $16,500 moved from Lucian Development's account to Piccarreto's account.  The next day, Lucian Development transferred $15,000 apparently as a redemption payment to an investor, $13,500 to another affiliated business's Bank of America account, approximately $11,000 to an IRA custodian, and $284,000 to one of First Nationle's Bank of America accounts.

e.     First Nationle's account had a negative balance of about –$46 before receiving the $284,000.  Upon receiving these funds, it immediately transferred $18,000 and $50,000 to two separate Bank of America accounts under the Individual Defendants' control, and those accounts transferred funds to a payroll company. The same day, a transfer of $172,800 was made from First Nationle's account to Santillo's personal Bank of America account.

70.    The transactions described above are reflected in the following chart:



71.    Additional examples of suspicious account activity include:

**Mid-July 2014 Transactions**

72.    On July 9, 2014, Percipience's Bank of America account had a balance of $451.61. The next day, it received deposits of $201,000 from two investors, and it received an additional $20,000 on July 14.

73.    On July 15, 2014, Percipience transferred $187,200 to the Middlebury Development account, which had a previous balance of $0.00.

74.    That same day, Middlebury transferred $165,000 to Lucian Development's Bank of America account and paid $22,125 to a law firm.

75.    Also on that day, Lucian sent $15,000 to Christopher Parris's Bank of America account, $15,000 to an unknown source, and $35,000 to a Bank of America account under First Nationle's name.

76.    On July 16, 2014, Lucian sent $71,500, apparently as a redemption payment to an investor.

**Late-July 2014 Transactions**

77.    From July 21 to July 29, 2014, a First Nationle account at Bank of America received $233,000 from a single investor and $532,859 from six apparent investors.

78.    That same week, the First Nationle account paid $480,000 to Santillo's Bank of America account, but received $370,000 from the same Santillo account on July 28, 2014.

79.    Also during this week, First Nationle paid $73,087 in apparent redemption payments to investors, $75,500 in property taxes, $12,000 to another Bank of America account under the Individual Defendants' control, and transferred $440,500 to Lucian Development's Bank of America account, which had a previous balance of $3,560.

80.     Almost immediately, Lucian Development sent $164,000 in apparent redemption payments to three investors.  It also sent $126,562 to a business associate, $31,500 to another Bank of America account under the Individual Defendants' control, and approximately $70,000 to an escrow company.

**September 2016 Transactions**

81.     On September 7, 2016, Middlebury Development's Bank of America account had a balance of $9,927.76.  Over the next two days, it received $435,000 from United RL.

82.     During the same two days, Middlebury Development transferred $400,000 to Lucian Development's Bank of America account and $10,000 to Percipience's Bank of America account.  Percipience then paid approximately $9,400 in an apparent redemption payment to an investor.

83.     Upon receiving the $400,000, Lucian Development immediately sent $25,840 to a payroll company, $10,837 to Defendant Piccarreto, and $303,000 to First Nationle's Bank of America account.

84.     On September 8 and 9, First Nationle paid approximately $188,000 in apparent redemption payments to two investors, $15,000 in an apparent loan repayment to a lender, and $30,450 to Santillo's personal Bank of America account.

**Bank of America Employees Act to Keep the Ponzi Scheme Afloat**

85.     Bank of America acted to conceal the Individual Defendants' fraud from detection, keep their accounts open, and affirmatively assist the Individual Defendants' ongoing Ponzi scheme.

86.     For example, Derline Cunningham made a practice of clearing large investor deposit checks for the Individual Defendants on the day of deposit.  Rozanne Vleck, acting in her

capacity as Santillo's and Parris's office manager and assistant, would routinely hand deliver high-value investor deposit checks, often from out of the state, directly to Cunningham. Bank of America placed automatic, multi-day holds on such checks in order to allow time for them to clear. Cunningham, as the branch manager, routinely lifted holds on these checks—according to Perry Santillo, more than fifty to one hundred times over the course of the scheme—when the accounts receiving the funds had low or zero balances, and thus provided the Individual Defendants access to large sums of money, helping them to avoid overdraft alerts that might have called unwanted attention to the scheme.

87.    At first, Cunningham lifted these freezes upon Santillo's request; as time passed, she began to clear investor deposit checks for Santillo and Parris on her own initiative when the accounts into which they had been directed for deposit had low, zero, or negative balances. Had Cunningham refused to lift holds on these large deposits, the Individual Defendants' Ponzi scheme would have collapsed years earlier than it did, because insufficient balances would have led to late or missing payments, or checks being returned.

88.    Ponzi schemes, particularly in the later stages of their life cycles, operate on a razor's edge. Without immediate and constant access to new funds, the scheme collapses. With large-scale Ponzi scheme frauds, the immediate availability of capital is essential—a week, a day, or sometimes a few hours can be the difference between the continuation of the scheme or its discovery. Here, any failures or delays in payment resulting from Bank of America's automatic holds would have led investors to inquire and complain, just as they did when they stopped receiving payments at or around the time of the filing of the SEC action. This also would have led to the intervention of regulators.

89.     Cunningham also vouched for the Individual Defendants to their creditors, and particularly to American Express—the main line of credit supporting the day-to-day operations of the Ponzi scheme.  Perry Santillo had an American Express Centurion card that he and the other Individual Defendants used for most, if not all, of their business expenses, as well as some personal expenses.  The monthly balance on the card was typically $350,000 to $500,000.

90.     Because the monthly balance on the American Express card was so high, American Express called Santillo quarterly, from approximately 2010 onward, for verification that his accounts held sufficient funds to cover the monthly balance.  American Express told Santillo that without verification, either in the form of account statements or a conference call with a bank representative, American Express would freeze spending on his Centurion card.

91.     Santillo contacted Cunningham in advance of these calls to secure her assistance. On each occasion, Santillo would ask Cunningham to tell American Express that his account balances were much higher than they actually were, giving her specific (and false) account balances to relay to American Express.  Cunningham always complied.  On one occasion, for example, at Santillo's request, Cunningham told American Express that Santillo had more than $950,000 in his Bank of America accounts when, in fact, they held approximately $17,000.  Based on Cunningham's lies, American Express allowed Santillo and the other Individual Defendants to continue spending on the Centurion card.  Cunningham's repeated lies, acting as a representative of Bank of America, to American Express on Santillo's and Parris's behalf allowed them and the other Individual Defendants to continue funding their fraudulent scheme.  Cunningham was also aware, through Santillo and American Express, that without her intervention on behalf of Bank of America (and later Citizens), American Express would close Santillo's line of credit, thus inhibiting the Individual Defendants' ability to operate their scheme.

27

92.     The Individual Defendants were among the biggest clients at Bank of America's State Street Branch.  According to Santillo, Cunningham knew and understood their "business model" from the early years of their relationship with Bank of America forward.  She was aware that the Individual Defendants solicited investments from people around the country, deposited the investments into their various accounts at Bank of America, and then routinely shuttled money through the accounts, often with the funds departing their structure of accounts through cash withdrawals or as checks written from the Individual Defendants' personal accounts.  When the Individual Defendants needed assistance to ensure the survival of their scheme—when, for example, they needed a bank representative to vouch for their accounts or lift a hold on a large deposit—they went to Cunningham because they knew that she would do as they asked without fail.

93.     Bank of America (and, later, Citizens) obtained extensive financial benefits from its banking relationship with the Individual Defendants and their Ponzi scheme entities.  Banks, such as Bank of America, charge various fees associated with maintaining accounts and conducting large transfers.  Additionally, banks benefit from the use of funds held in deposit accounts by investing or lending those funds at higher rates of return than the interest rates paid to depositors.  Here, where the funds were regularly being moved among accounts, the Individual Defendants' accounts rarely earned interest, thus making their business even more profitable for Bank of America.

94.     Parris and Santillo had a longstanding and pre-existing relationship with another Bank of America employee, Eric Allen, Vice President and Relationship Manager in Commercial Banking.  Allen, Santillo, and Parris had first met in 2003 or 2004, when they worked together at New York Life Investment Management Services.

28

95.    At Bank of America, Allen was specifically tasked with conducting periodic examinations of the Individual Defendants' businesses and accounts, which, as detailed above, were vehicles for their fraudulent scheme.  When conducting these investigations, Allen dealt directly with Parris.  None of Allen's investigation ever resulted in any interruption, curtailment, or termination of the Individual Defendants' and their entities' full use of Bank of America's services.

96.    Santillo also alerted Derline Cunningham in advance of each investigation and asked her to find out if he and Parris "were alright."

97.    In or around 2014, consistent with their prior practice, Santillo and Parris opened a series of Bank of America accounts for various First Nationle entities.  Santillo and Parris's account practices triggered an internal Bank of America investigation.  Bank representatives questioned Parris by email, and then at an in-person meeting.  They interrogated him regarding the unusual nature of the account openings, the unusual quantity of account openings, and the atypical nature and amount of the transfers being processed through the First Nationle accounts. Representative atypical and suspicious transfers are set forth above, *see* ¶¶ 68, 69, 72–79, *supra*.

98.    Even after its 2014 investigation, Bank of America did nothing to address the atypical activity among the more than one hundred interrelated accounts, and instead continued to serve as the Ponzi schemers' primary banking institution until approximately 2016, when Parris and Santillo voluntarily moved the bulk of their business to Citizens.  *See* ¶ 101, *infra*.

**Citizens Facilitates the Ponzi Scheme**

99.    In approximately 2015, the Individual Defendants — and in particular Santillo and Parris — began experiencing financial difficulties.  To address these difficulties and prevent the collapse of their scheme, they sought and secured short-term, high-interest loans from various non-

traditional lending institutions.  To service these loans, Santillo and Parris arranged for automatic debits from several of their business accounts at Bank of America.

100.     In early 2016, the Individual Defendants began incurring negative balances on the Bank of America accounts linked to the short-term, high-interest loans.

101.     Soon thereafter, in or around the summer of 2016, Derline Cunningham took a job as a branch manager at Citizens.  She alerted Parris and Santillo and asked them to move their accounts to Citizens.  Parris and Santillo agreed, and opened at least twenty accounts at Citizens with Cunningham's assistance.  Parris and Santillo did not, however, close their accounts at Bank of America.

102.     Months later, Bank of America closed all of the Individual Defendants' accounts and all related personal and business accounts, including Santillo's mother-in-law's personal bank accounts.

103.     Immediately upon establishing accounts at Citizens, the Individual Defendants began transferring, commingling, and misdirecting investor funds among the accounts, as they had at Bank of America.  The accounts opened at Citizens included investor accounts for First Nationle, United RL, Middlebury Development, Lucian Development, and other entities, as well as rental escrow accounts and personal accounts for Santillo and Parris.

104.     Millions of dollars passed through the accounts every month, with tens or hundreds of thousands of dollars routinely deposited into, and then immediately transferred from, a single account on the same day.  Funds also moved across accounts held by different entities—all affiliated with each other and all under the Individual Defendants' control—and were transferred out of investor accounts to cover business and personal expenses.  For example:

     a.     At the end of the day on June 7, 2017, First Nationle's Citizens account ending in 3921 had an insufficient funds balance of ($23,161.08).

b. On June 8, 2017, the First Nationle account received $722,755.47 from investors.

c. On that same day, First Nationle transferred $700,000 from its Citizens account to Lucian Development's Citizens account ending in 2933[11] which previously had an insufficient funds balance of ($20,918.44).

d. Also on June 8, 2017, and immediately after receiving the $700,000 from First Nationle, Lucian Development transferred $490,000 to Middlebury Development's Citizens account ending in 5217, which previously had an insufficient funds balance of ($2,613.14).

e. Later on June 8, 2017, and immediately after receiving the $490,000 from Lucian Development, Middlebury Development transferred $215,000 to United RL Capital Services' Citizens account ending in 5101, which previously had an insufficient funds balance of ($113,156.97). That same day, Middlebury Development also transferred $149,000 to a Citizens account ending in 4162, and upon information and belief, that account was under the Individual Defendants' control.

f. Lastly, on June 8, 2017, and immediately after receiving the $215,000 from Middlebury Development, United RL Capital wire transferred $166,910 out of the Citizens network of accounts.

g. Of the $722,755.47 in investor funds deposited into First Nationle on June 8, 2017, Lucian Development, Middlebury Development, and United RL Capital wired a total of $403,910 out of the Citizens network of accounts the same day. Lucian Development wired out over $130,000; Middlebury Development wired out $107,000, and United RL Capital wired out $166,910.

---

[11] Additionally, on June 8, 2017, First Nationle transferred $15,000 to its affiliate Ocala Investments' Citizens account ending in 4049. That same day, First Nationle also transferred $5,800 to its affiliate Boyles America's Citizens account ending in 2836. First Nationle also made four outgoing wire payments on June 8 totaling $16,362.67, apparently for redemption payments to investors. As a result of these outgoing transfers, First Nationle's Citizens account ending in 3921 had insufficient funds at the end of the day on June 8, 2017.

105.    The transactions described above are reflected in the following chart:

Citizens Shuttles Hundreds of Thousands of Dollars Amongst Accounts in One Day

106.   Additional examples of suspicious account activity include, but are not limited to:

   a.   At the end of the day on August 31, 2016, First Nationle's Citizens account ending in 3921 had a balance of $2,803.50.

   b.   On September 1, 2016, the First Nationle's account received $442,850.38 from investors.  The same day, the Individual Defendants withdrew $443,000.00 in cash from First Nationle, leaving the account with a balance of $2,653.88.

   c.   There were no further transactions in the First Nationle account until September 8, 2016, when the account received $374,281.53 from investors.  On the same day, the Individual Defendants withdrew $374,000.00 in cash from First Nationle, leaving the account with a balance of $2,935.41.

   d.   There were no further transactions in the First Nationle account until September 13, 2016, when the account received $254,508.83 from investors.  On the same day, the Individual Defendants wired $255,000.00 out of First Nationle, leaving the account with a balance of $2,444.24.

   e.   There were no further transactions in the First Nationle account until September 16, 2016, when the account received $634,933.44 from investors.  On the same day, the Individual Defendants wired $630,000.00 out of First Nationle, leaving the account with a balance of $7,356.74 after incurring a $20.94 service fee.

   f.   There were no further transactions in the First Nationle account until September 20, 2016, when the account received $176,943.17 from investors.  The next day, September 21, the Individual Defendants wired $176,000.00 out of First Nationle, leaving the account with a balance of $8,299.91.

   g.   There were no further transactions in the First Nationle account until September 23, 2016, and September 26, 2016, when it received a combined $270,040.29 from investors.  On September 26, the Individual Defendants wired $270,000.00 out of First Nationle, leaving the account with a balance of $8,340.20.

   h.   There were no further transactions in the First Nationle account until September 28, 2016, when the account received $136,930.42 from investors.  The next day, September 29, the Individual Defendants wired $136,000.00 out of First Nationle, leaving the account with a balance of $9,270.62.

107.   In November 2016:

   a.   On November 22, 2016, United RL Capital Services' Citizens account ending in 5101 had a balance of $33,638.22.

   b.   On November 23, 2016, the United RL Capital Services account received $238,218.47 from investors.

   c.   That same day, the United RL Capital Services account transferred $68,800.00 to Middlebury Development's Citizens account ending in 5217, which previously had an insufficient funds balance of ($749.53).

   d.   Five days later and having received no additional cash from any source, on November 28, 2016, Middlebury Development transferred $68,000.00[12] to First Nationle's Citizens account ending in 3921, which  previously had a balance of $233,867.29.

   e.   The same day, November 28, First Nationle combined the $68,000.00 received from Middlebury Development (money that had been originally invested in United RL Capital) with funds already in First Nationle's Citizens account to transfer $278,000.00 to First Nationle's secondary Citizens account ending in 7370, which previously had a zero balance.

   f.   On the next day, November 29, 2016, First Nationle transferred $137,500 from its secondary Citizens account transferred back to its Citizens account ending in 3921. Then, on the same day, it transferred $37,500 out of this account by wire.

108.   In April 2017:

   a.   At the end of the day on April 12, 2017, United RL Capital Services' Citizens account ending in 5101 had a balance of $42,964.35.

   b.   On April 13, 2017, the United RL Capital Services account received $127,900.00 from investors.

   c.   The same day, the United RL Capital Services account transferred $120,000.00 to Middlebury Development's Citizens account ending in 5217, which previously had a balance of $10,669.21.

   d.   Also on April 13, 2017, and immediately after receiving the $120,000.00 from United RL Capital Services, Middlebury Development transferred $120,000.00 to Lucian Development's Citizens account ending in 2933, which previously had a balance of $13,109.44.

   e.   Still on April 13, 2017, and immediately after receiving the $120,000.00 from Middlebury Development, Lucian Development transferred $120,000.00 to First Nationle's Citizens account ending in 7370, which previously had a balance of $79.44.

   f.   The very next day, April 14, 2017, First Nationle transferred $120,000.00 back to Lucian Development's Citizens account ending in 2933, which ended April 13, 2017 with only $6,202.70.

---

[12] As a result of this outgoing transfer, Middlebury Development's Citizens account was left with a balance of $50.43.

g.  On April 14, 2017, one day after $127,900.00 in investor funds was initially received by United RL Capital Services, and then immediately passed through Middlebury Development, Lucian Development, First Nationle, and then back to Lucian Development, the Lucian Development account transferred $120,000.00 out of the Citizens network of accounts by wire.

109.  In May 2017:

a.  At the end of the day on May 22, 2017, United RL Capital Services' Citizens account ending in 5101 had an insufficient funds balance of ($12,834.56).

b.  On May 23, 2017, the United RL Capital Services account received $220,000.00 from investors.

c.  The next day, May 24, 2017 the United RL Capital Services account transferred $130,000.00 to Middlebury Development's Citizens account ending in 5217, which previously had a balance of $38,215.61.

d.  Also on May 24, 2017, and immediately after receiving the $130,000.00 from United RL Capital Services, Middlebury Development transferred $125,000.00 to Lucian Development's Citizens account ending in 2933, which previously had a balance of $8,341.37.

e.  Then, on May 24, 2017, one day after $220,000.00 of investor funds was initially received by United RL Capital Services and immediately passed through Middlebury Development to Lucian Development, the Lucian Development account transferred $125,000.00 out of the Citizens network of accounts by wire.

110.  These rapid movements of funds among accounts, including the commingling and ultimate misappropriation of investor funds through personal accounts at Citizens, were clear indicators of fraud and misconduct by the Individual Defendants, and were enabled and assisted by Citizens.

111.  At Citizens, Cunningham continued to vouch for the Individual Defendants to American Express, taking quarterly calls from the creditor and representing that Santillo's accounts held hundreds of thousands of dollars when, in fact, they carried low, zero, or negative balances.  *See* ¶¶ 89–91, *supra*.

112.  Soon after Cunningham opened the Individual Defendants' accounts at Citizens, she was due to make one of her routine, quarterly calls to American Express.  Santillo called her

multiple times to tell her what he needed her to say, and to prompt her to make the call. Cunningham was not responsive at first, but finally, she contacted Santillo and asked him for a $20,000 personal "loan."  Understanding that she was asking for a quid pro quo in exchange for her continued assistance in furthering the Ponzi, Santillo paid her $20,000.  Once the "loan" came through—and only after it did—Cunningham placed the call to American Express.  The "loan" was no-interest, not memorialized, and had no terms attached—not even a repayment term. Cunningham never repaid the "loan."  She did however, continue to cover for the Individual Defendants and assist them in advancing their Ponzi scheme.

113.    According to Rozanne Vleck, Santillo's and Parris's administrative assistant, Cunningham also sought and received a similar $20,000 "loan" from Parris, which she never repaid.

### Applicable Banking Regulations

114.    Bank of America and Citizens knowingly, extensively, and egregiously violated federal banking regulations in their dealings with Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner.  Under federal law, banks are required to know their customers and understand their banking behavior.  Under relevant banking regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(1), (2).  In order to do so, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

115.    Bank of America and Citizens are also bound to comply with Bank Secrecy Act ("BSA"), a federal statute designed to detect and prevent money laundering.

116.    In accordance with their federal and state regulatory compliance obligations, banks must develop, administer, and maintain a program that ensures compliance with the BSA.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

117.    Banks must develop a customer due diligence program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, in order to provide the bank with a way to identify unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

118.    Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) the purpose of the account; (2) the source of funds; (3) the proximity of a customer's residence to the bank; and (4) any explanations for changes in account activity.

119.    Banks must also identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

120.    The federal government established the Federal Financial Institutions Examinations Council ("FFIEC") in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering Manual contains an overview of BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures.  The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual p. 5 (2010).

121.    Banks must also ensure that their employees follow BSA guidelines.  Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.  Accordingly, banks are required to train all personnel whose duties may require knowledge of the BSA or its requirements.

122.    Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual, including: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person, to or from different accounts; (3) transactions inconsistent with the accountholder's business; (4) transfers of funds among related accounts; (5) loans that are secured by account deposits; (6) loans that lack a legitimate business purpose, provide the bank with excessive fees for assuming little or no risk, or obscure movement of funds; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (8) transacting businesses sharing the same address.

**Plaintiffs' Investments in the Ponzi Scheme**

123.    Plaintiffs Heinert and Schultz sustained damages as a result of their investments in the Ponzi scheme perpetuated by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner, and aided and abetted by Bank of America and Citizens.

***Mary Beth Heinert and Richard H. Schultz, Jr.***

124.    Mrs. Heinert and Mr. Schultz, Jr. are the daughter and son of Richard H. Schultz ("Mr. Schultz") who passed away in Ocala, Florida, in May 2016 at the age of 85.

125.    Mr. Schultz was, for years, a client of financial adviser Kenneth E. Smith, III, who offered financial advisory services through his company, KE Smith Tax Advisory Group, Inc., doing business under a fictitious name, USA Tax & Financial Consultants, located at 3220 Southwest 31st Street, Suite 202, Ocala, Florida.

126.    At some point in 2012, Mr. Smith sold his financial advisory business and its fictitious name to Ocala Investment Services, LLC, which is owned and managed by Defendant Christopher Parris.

127.    Between September 2012 and February 2015—the same period during which Bank of America was conducting an internal investigation into the Individual Defendants' scheme—Mr. LaRocco persuaded Mr. Schultz to invest $263,430 in promissory notes issued by First Nationle and $250,000 in membership interests issued by Percipience.

128.    Following Mr. Schultz's death, Mrs. Heinert and Mr. Schulz, Jr., each inherited one-half of Mr. Schultz's investments in First Nationle and Percipience.

129.    In addition, Mr. LaRocco persuaded Mrs. Heinert to invest additional funds in United RL, which he held out as being in the business of arranging financing for physicians and medical organizations who wished to establish their own medical laboratories.

130.    In July 2016, after reviewing the offering materials for United RL, Mrs. Heinert invested $350,000 in membership interests in United RL.

131.    Two months later, in September 2016, Mrs. Heinert made a second investment of $100,000 in United RL.

132.    Plaintiffs' investments were held in and transferred among various Bank of America and Citizens accounts and used as part of the Ponzi scheme to either pay earlier investors or misappropriated by the Individual Defendants to their private accounts.  Plaintiffs also received small "dividends" from Bank of America, which were paid to them as part of the Ponzi scheme to give it an air of legitimacy.

133.    Mrs. Heinert and Mr. Schultz, Jr., lost the majority of their investments.

134.    At no time did LaRocco, the other Individual Defendants, or anyone else associated with them disclose to Mrs. Heinert, Mr. Schultz, or Mr. Schultz Jr. that the investments in First Nationle, Percipience, and United RL were sham investments, that their money would be commingled with other investor funds and diverted for any purpose other than legitimate investment, that the vehicles in which they had invested were fronts for a Ponzi scheme, that the investment funds would be transferred to the Individual Defendants' accounts for their personal use, or any other detail of the Individual Defendants' scheme.

135.    Mr. Schultz, Mr. Schultz Jr., and Mrs. Heinert relied on Defendants' omissions. Had the Individual Defendants, or any other party, disclosed at any time that the investments were a sham, neither Mr. Schultz nor Plaintiffs would have invested, or continued investing, with the Individual Defendants.

136.    There are no material differences between Defendants' actions and practices directed to Plaintiffs and their actions and practices directed to the putative Class.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

137.    Plaintiffs and Class members did not and could not have discovered the facts constituting Defendants' violations until the SEC filings were made available to the public on June 18, 2018.

138.    The Individual Defendants concealed their wrongdoing, as well as Bank of America's and Citizens' assistance thereto, by carrying out the complex series of transactions through which Plaintiffs' funds were misappropriated, commingled, and misused.

139.    The Individual Defendants also concealed the Ponzi scheme by misrepresenting the performance of the investments to investors.  They provided account statements that falsely stated the funds were invested in the issuing companies.  Other statements falsely stated returns and bonuses.

140.    Bank of America and Citizens personnel also actively concealed the fraud by the conduct alleged herein. Derline Cunningham, for example, placed quarterly calls to American Express to vouch for the Individual Defendants' accounts so that American Express would continue to extend credit to the Individual Defendants, and their fraud could proceed undetected.

141.    Plaintiffs learned of the actions of the Individual Defendants and Bank of America and Citizens—directly or indirectly—through the SEC action and media coverage about them.

142.    Because Plaintiffs and the Class could not have reasonably discovered the facts constituting Defendants' violations until June 18, 2018, their claims accrued on that date and any applicable statutes of limitation were tolled until that date.

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this lawsuit as a Class Action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

144.     The Class is defined as:

**All persons who invested in First Nationle Solution, Percipience Global, United RL, Lucian Development, Middlebury Development, Genvest, Next Medical Solutions, and/or any other investment vehicle created by the Individual Defendants after January 1, 2008.**

145.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

146.     The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

147.     <u>Numerosity</u>.  The Class consists of more than 600 geographically dispersed individuals.  Joinder of the Class members is not practicable.  The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

148.     <u>Ascertainability</u>.  The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner as well as through an examination of Bank of America's and Citizens' records.  Notice of this action can thus be provided to all members of the proposed Class.

149.     <u>Typicality</u>.  Plaintiffs were investors in the businesses owned and managed by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner at the time of the wrongdoing alleged herein.  Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by Defendants' wrongful conduct as complained of herein.

150.     <u>Adequacy</u>.  Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

151.    <u>Commonality and Predominance</u>.  Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class.  The questions of law and fact common to the Class include, but are not limited to:

a.      Whether the offering materials approved for each business were fraudulent;

b.      Whether the Individual Defendants knew that the offering materials for each of the businesses were fraudulent and substantially assisted the fraud that was carried out against the investors;

c.      Whether the Individual Defendants breached their fiduciary duties to the investors in the businesses;

d.      Whether the Banks aided and abetted the Individual Defendants' fraud and breaches of fiduciary duty; and

e.      Whether the Banks had actual knowledge that the Individual Defendants' were committing investor fraud, breaching fiduciary duties, and misappropriating investor funds.

152.    The Class may be certified under Rule 23(b)(3).  Questions of law or fact common to Class members predominate over any questions affecting only individual members.  Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.  Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.  There will be no unusual difficulty in the management of this action as a Class action.

## COUNT I – AIDING AND ABETTING COMMON LAW FRAUD
### (against Bank of America)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 182–193 as if fully set forth herein.

153.    Bank of America had actual knowledge of the fraud that was being committed by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner.  In addition to what is set forth above, the facts that indicate the actual knowledge of the fraud include, for example, the following:

a.    Beginning in 2005, Santillo and Parris were in frequent contact with Bank of America — including Branch Manager Derline Cunningham and Eric Allen — who opened more than one hundred Bank of America accounts, often without first obtaining an authorizing signature, including accounts in the name of their fraudulent businesses and personal accounts used to divert and misappropriate investor funds.

b.    Bank of America understood the Individual Defendants' business model and knew that the funds deposited in the Individual Defendants' accounts were investor funds. Bank of America acquired this knowledge through Derline Cunningham, as a result of its account opening and monitoring practices, and from its several investigations into the Individual Defendants' practices.  Bank of America knew that the Individual Defendants received investor funds into Bank of America accounts which, rather than being applied to the investment opportunities for which they were intended, were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles.

c.    Bank of America knew that investor funds traveled rapidly in and out of the Individual Defendants' accounts, including rental escrow accounts, with large sums transferred to accounts with low, zero, or negative balances, and then quickly out. Additionally, Derline Cunningham and Eric Allen knew and understood the Individual Defendants' business model and knew that the funds they were commingling and moving among and out of the accounts were investor funds intended for investment in a single vehicle.

d.    Derline Cunningham knew that Bank of America imposed mandatory, multi-day holds on large check deposits, but lifted these holds and cleared large investor deposit checks for Parris and Santillo when they needed funds to keep the Ponzi scheme afloat, at first at Parris and Santillo's request, but thereafter often without being asked.

e.    Derline Cunningham routinely lied to American Express on behalf of the Individual Defendants and their scheme by intentionally misrepresenting to the creditor that Santillo had hundreds of thousands of dollars in his accounts—enough to cover the balances on his card—when, in fact, as she knew, his accounts held insufficient funds.

f.    Bank of America conducted numerous inquiries into the Individual Defendants' business accounts, having been alerted to the atypical activity that characterized the accounts.  In each instance, after speaking with Parris, Bank of America closed its

investigations and allowed the atypical transactions that flooded the accounts to continue.

g.   Bank of America's employee and agent, Derline Cunningham, took financial compensation for her assistance with the Individual Defendants' fraudulent scheme, and took their accounts with her when she left Bank of America to take a managerial position at Citizens. Once at Citizens, she requested $40,000 from Parris and Santillo for her continued assistance with the fraud, which Santillo understood to be a quid pro quo and which Cunningham never repaid.

154.   Over the course of the decade-plus business relationship between Bank of America and the Individual Defendants, Bank of America rendered substantial assistance to Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner in commission of their fraud against the investors by, among other things, the following acts:

a.   Bank of America routinely executed atypical fund transfers among the Individual Defendants' accounts for many years, including rapid, same-day transfers of large sums in and out of accounts with low, zero, or negative balances; transfers from rental escrow accounts to other, non-fiduciary accounts; and transfers of investor funds from their designated investment vehicles' accounts to the Individual Defendants' personal accounts, vendors, and other business accounts.

b.   Bank of America opened more than one hundred accounts for Parris and Santillo, sometimes without requiring an authorizing signature.

c.   Derline Cunningham, as a Bank of America employee, routinely and intentionally lied on behalf of the Individual Defendants to American Express when their accounts in fact held insufficient funds to cover the Individual Defendants' debts.

d.   Derline Cunningham lifted holds on large checks when the Individual Defendants needed funds to keep their scheme afloat, and sometimes did so without being asked.

e.   Bank of America conducted multiple inquiries and investigations into the Individual Defendants' accounts and businesses, but left the accounts open for the duration of its relationship with the Individual Defendants despite the significant suspicious activity that plagued the accounts.

155.   The specific misconduct that gives rise to this claim for aiding and abetting common law fraud reflected a criminal indifference to Bank of America's civil obligations, and in fact, at times, involved criminal wrongdoing. Bank of America's conduct was intentional,

45

malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors. Therefore, an award of punitive damages is appropriate. In addition, senior management of Bank of America engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

156.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against Bank of America for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Bank of America)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 194–199 as if fully set forth herein.

157.    Because Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner held themselves out to be investment advisers, each of them owed a fiduciary duty to the investors. These fiduciary duties apply by operation of law and the terms of the investments, which state that Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner have a "general-and-unsubordinated obligation" to the investor.

158.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner breached the fiduciary duties directly owed to the investors by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

159.    Bank of America had actual knowledge of the Individual Defendants' fiduciary obligations to their investors and their concomitant breaches of fiduciary duty. In addition to what is set forth above, the facts that indicate the actual knowledge of these breaches include, for example, the following:

a.   Bank of America understood the Individual Defendants' business model and knew that the funds deposited in their accounts were investor funds. Bank of America acquired this knowledge through Derline Cunningham and Eric Allen, as a result of its account opening and monitoring practices, and from its several investigations into the Individual Defendants' practices. Bank of America knew that the Individual Defendants received investor funds into Bank of America accounts which, rather than being applied to the investment opportunities for which they were intended, were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles.

b.   Beginning in 2005, Santillo and Parris were in frequent contact with Bank of America—including Branch Manager Derline Cunningham—who opened more than one hundred Bank of America accounts, often without first obtaining an authorizing signature, including accounts in the name of their fraudulent businesses and personal accounts used to divert and misappropriate investor funds.

c.   Bank of America knew that investor funds traveled rapidly in and out of the Individual Defendants' accounts, including rental escrow accounts, with large sums transferred to accounts with low, zero, or negative balances, and then quickly transferred out. Additionally, Derline Cunningham and Eric Allen knew and understood the Individual Defendants' business model and knew that the funds they were commingling and moving among and out of the accounts were investor funds intended for investment in a single vehicle.

d.   Derline Cunningham knew that Bank of America imposed multiday holds on large check deposits, but lifted these holds and cleared large investor deposit checks for Parris and Santillo when they needed funds to keep the Ponzi scheme afloat, at first at Parris and Santillo's request, but thereafter sometimes without being asked.

e.   Derline Cunningham routinely and intentionally lied on behalf of the Individual Defendants' accounts to American Express, misrepresenting to the creditor that Santillo had hundreds of thousands of dollars in the accounts—enough to cover the balances on his card—when, in fact, as she knew, the accounts held insufficient funds.

f.   Bank of America conducted multiple inquiries into the Individual Defendants' business accounts, having been alerted to the atypical activity that characterized the accounts. In each instance, after speaking with Parris, Bank of America closed its investigations and allowed the atypical transactions that flooded the accounts to continue.

g.   Bank of America's employee and agent, Derline Cunningham, took financial compensation for her assistance with the Individual Defendants' fraudulent scheme, and took their accounts with her when she left Bank of America to take a managerial position at Citizens. Once at Citizens, she requested $40,000 from Parris and Santillo for her continued assistance with the fraud, which Santillo understood to be a quid pro quo and which Cunningham never repaid.

160.    Over the course of the decade-plus business relationship between Bank of America and the Individual Defendants, Bank of America rendered substantial assistance to Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner in commission of their fiduciary breaches by, among other things, the following acts:

a.    Bank of America routinely executed atypical fund transfers among the Individual Defendants' accounts for many years, including rapid, same-day transfers of large sums in and out of accounts with low, zero, or negative balances; transfers from rental escrow accounts to other, non-fiduciary accounts; and transfers of investor funds from accounts held by the investment vehicle designated by the investor to the Individual Defendants' personal accounts, vendors, and other business accounts.

b.    Bank of America opened more than one hundred accounts for Parris and Santillo, sometimes without requiring an authorizing signature.

c.    Derline Cunningham, as a Bank of America employee, routinely and intentionally lied on behalf of the Individual Defendants to American Express when their accounts in fact held insufficient funds to cover the Individual Defendants' debts.

d.    Derline Cunningham lifted holds on large checks when the Individual Defendants needed funds to keep their scheme afloat, and sometimes did so without being asked.

e.    Bank of America conducted numerous inquiries and investigations into the Individual Defendants' accounts and businesses, but left the accounts open for the duration of its relationship with the Individual Defendants despite the significant suspicious activity that plagued the accounts.

161.    Because of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

162.    The specific misconduct that gives rise to this claim for aiding and abetting breach of fiduciary duty reflected a criminal indifference to Bank of America's civil obligations, and in fact, at times, involved criminal wrongdoing.  Bank of America's conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors.  Therefore,

an award of punitive damages is appropriate.  In addition, senior management of Bank of America engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

163.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT III – AIDING AND ABETTING COMMON LAW FRAUD
### (against Citizens)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 182–193 as if fully set forth herein.

164.    Citizens had actual knowledge of the fraud that was being committed by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner.  In addition to what is set forth above, the facts that indicate the actual knowledge of the fraud include, for example, the following:

a.    Upon their arrival at Citizens, Cunningham opened at least twenty accounts for the Individual Defendants and their various businesses.  Based on her experience at Bank of America, Cunningham knew that the Individual Defendants' business operations were fraudulent and that their accounts would be used as engines of their fraudulent scheme.

b.    Derline Cunningham, a Citizens branch manager, knew and understood the Individual Defendants' business model, and had for many years by the time she arrived at Citizens.

c.    Citizens knew—as a result of its account opening and monitoring practices and its employees' observation of chronic atypical activity across the accounts— that the Individual Defendants received investor funds into Citizens accounts which, rather than being applied to the investment opportunities for which they were intended, were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles.

d.    Citizens knew that investor funds traveled rapidly in and out of the Individual Defendants' accounts, with large sums transferred to accounts with low, zero, or negative balances, and then quickly transferred out of those accounts.

e.    Derline Cunningham knew that Citizens imposed holds on large investor deposit checks, but she lifted these holds and cleared large check deposits for Parris and

Santillo when they needed funds to keep the Ponzi scheme afloat, sometimes at Parris and Santillo's request, and sometimes without being asked.

f.    Derline Cunningham routinely and intentionally lied on behalf of the Individual Defendants to American Express, misrepresenting to the creditor that Santillo had hundreds of thousands of dollars in his accounts—enough to cover the balances on his card—when, in fact, as she knew, the accounts held insufficient funds.

g.    While at Citizens, Derline Cunningham took financial compensation for her continued assistance with the Individual Defendants' fraudulent scheme. She requested $40,000 from Parris and Santillo, and only continued to vouch for the accounts once she received payment. Santillo understood her request to be one for a quid pro quo, and Cunningham never repaid Parris or Santillo.

165.    Citizens rendered substantial assistance to Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner in commission of their fraud against the investors by, among other things, the following acts:

a.    Citizens routinely executed atypical fund transfers among the Individual Defendants' accounts for many years, including rapid, same-day transfers of large sums in and out of accounts with low, zero, or negative balances; transfers from rental escrow accounts to other, non-fiduciary accounts; and transfers of investor funds from their designated investment vehicles' accounts to the Individual Defendants' personal accounts, vendors, and other business accounts.

b.    Citizens opened at least twenty accounts for Parris and Santillo, sometimes without requiring a signature prior to opening an account.

c.    Derline Cunningham, as a Citizens employee, routinely and intentionally lied on behalf of the Individual Defendants to American Express while at Citizens when their accounts in fact held insufficient funds to cover the Individual Defendants' debts.

d.    Derline Cunningham lifted holds on large investor deposit checks when the Individual Defendants needed funds to keep their scheme afloat, and sometimes did so without being asked.

166.    The specific misconduct that gives rise to this claim for aiding and abetting common law fraud reflected a criminal indifference to Citizens' civil obligations, and in fact, at times, involved criminal wrongdoing. Citizens' conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and

wanton disregard or indifference to the rights of the investors.  Therefore, an award of punitive damages is appropriate.  In addition, senior management of Citizens engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

167.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment against Citizens for compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (against Citizens)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 194–199 as if fully set forth herein.

168.    Because Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner held themselves out to be investment advisers, each of them owed fiduciary duties to the investors.  The fiduciary duties apply by operation of law and the terms of the investments, which state that Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner have a "general-and-unsubordinated obligation" to the investor.

169.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner breached the fiduciary duties directly owed to the investors by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

170.    Citizens had actual knowledge of the Individual Defendants' fiduciary obligations to their investors and the concomitant fiduciary breaches being committed by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner.  In addition to what is set forth above, the facts that indicate the actual knowledge of the breaches include, for example, the following:

    a.    Derline Cunningham, a Citizens branch manager, knew and understood the Individual Defendants' business model, and had for many years by the time she arrived at Citizens.

b.     Upon their arrival at Citizens, Cunningham opened at least twenty accounts for the Individual Defendants and their various businesses.  Based on her experience at Bank of America, Cunningham knew that the Individual Defendants' business operations were fraudulent and that their accounts would be used as engines of their fraudulent scheme.

c.     Citizens knew—as a result of its account opening and monitoring practices and its employees' observation of chronic atypical activity across the accounts—that the Individual Defendants received investor funds into Citizens accounts which, rather than being applied to the investment opportunities for which they were intended, were commingled and misappropriated, either being used to pay off earlier investors, or stolen to fund the Individual Defendants' lavish lifestyles.

d.     Citizens knew that investor funds traveled rapidly in and out of the Individual Defendants' accounts, with large sums transferred to accounts with low, zero, or negative balances, and then quickly transferred out of these accounts.

e.     Derline Cunningham knew that Citizens imposed holds on large check deposits, but she lifted these holds and cleared large investor deposit checks for Parris and Santillo when they needed funds to keep the Ponzi scheme afloat, sometimes at Parris and Santillo's request, and sometimes without being asked.

f.     Derline Cunningham routinely and intentionally lied on behalf of the Individual Defendants to American Express, misrepresenting to the creditor that Santillo had hundreds of thousands of dollars in his accounts—enough to cover the balances on his card—when, in fact, as she knew, the accounts held insufficient funds.

g.     While at Citizens, Derline Cunningham took financial compensation for her continued assistance with the Individual Defendants' fraudulent scheme.  She requested $40,000 from Parris and Santillo, and only continued to vouch for the accounts once she received payment.  Santillo understood her request to be one for a quid pro quo, and Cunningham never repaid Parris or Santillo.

171.   Citizens rendered substantial assistance to Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner in commission of their fiduciary breaches to investors by, among other things, the following acts:

a.     Citizens routinely executed atypical fund transfers among the Individual Defendants' accounts for more than a year, including rapid, same-day transfers of large sums in and out of accounts with low, zero, or negative balances; transfers from rental escrow accounts to other, non-fiduciary accounts; and transfers of investor funds from accounts held by their designated investment vehicle to the Individual Defendants' personal accounts, vendors, and other business accounts.

b.  Citizens opened at least twenty accounts for Parris and Santillo, sometimes without requiring a signature prior to opening an account.

c.  Derline Cunningham, as a Citizens employee, routinely and intentionally lied on behalf of the Individual Defendants to American Express while at Citizens when their accounts in fact held insufficient funds to cover the Individual Defendants' debts.

d.  Derline Cunningham lifted holds on large checks when the Individual Defendants needed funds to keep their scheme afloat, and sometimes did so without being asked.

172.  Because of the breaches of fiduciary duties directly owed to the investors, Plaintiffs and the Class suffered damages.

173.  The specific misconduct that gives rise to this claim for aiding and abetting breach of fiduciary duty reflected a criminal indifference to Citizens' civil obligations, and in fact, at times, involved criminal wrongdoing. Citizens' conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors. Therefore, an award of punitive damages is appropriate. In addition, senior management of Citizens engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

174.  By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT V – CIVIL CONSPIRACY
### (against Bank of America, Citizens, Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner)

Plaintiffs re-allege and incorporate paragraphs 1–142 and 182–193 as if fully set forth herein.

175.  At all relevant times, and as early as 2008, Bank of America, Citizens, Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner conspired to defraud investors by soliciting funds

for investment in Percipience, United RL, First Nationle, and the Individual Defendants' other investment vehicles, and then commingling and diverting those funds to pay earlier investors, and fund the Individual Defendants' business expenses and personal accounts. The underlying fraud is described herein in paragraphs 2, 3, 39–62, *supra*, and 182–193, *infra*.

176.    Each conspirator agreed to participate in the fraud by their words and/or actions, including, but not limited to:

(a) The Individual Defendants expressly agreed to perpetrate and engage in the fraud, as each undertook his role in the scheme with actual knowledge of its mechanics and purpose.

(b) Santillo, Parris, and Siwik, *inter alia*, devised the fraudulent scheme, bought books of business from investment advisers with the intention of defrauding their clients, agreed to use their existing companies as vehicles for fraud, and developed new entities to further advance the fraud.

(c) Santillo, Parris, Siwik, Brenner, LaRocco, and Piccarreto solicited investors to commit funds to the fraud and misrepresented the nature of the investment in so doing, all with the intention of accepting those funds and then diverting them for other purposes, including to pay off earlier investors, fund the fraudulent scheme, and line their own pockets.

(d) Santillo, Parris, Siwik, Brenner, LaRocco, and Piccarreto used investor funds to pay off earlier investors, commingled investor funds, and misappropriated investor funds.

(e) Bank of America executed myriad atypical transactions, lifted standard holds on large investor deposit checks; routinely and intentionally lied on behalf of the Individual Defendants, and misrepresented the amounts in their accounts to American Express so that the fraud could continue; and cleared the Individual Defendants' accounts to remain open after numerous investigations and despite actual knowledge that the accounts were being used to divert investor funds.

(f) Citizens executed myriad atypical transactions, lifted standard holds on large deposit checks; routinely and intentionally lied on behalf of the Individual Defendants, and misrepresented the amounts in their accounts to American Express so that the fraud could continue; and allowed the Individual Defendants to continue banking at Citizens despite actual knowledge that the accounts were being used to divert investor funds.

177.    Bank of America and Citizens committed overt acts in furtherance of their conspiracy through the acts alleged above in paragraphs 63–113, 154, 160, 165, and 171.

178.    The Individual Defendants committed overt acts in furtherance of their conspiracy through the acts alleged above in paragraphs 1–3, 18–23, and 37–62.

179.    As a direct and proximate consequence of Defendants' conduct as described in the foregoing, Plaintiffs and the Class have lost money they invested in the businesses, have been denied the use of their money, and have been damaged thereby in an amount to be determined at trial.

180.    The specific misconduct that gives rise to this claim for civil conspiracy reflected a criminal indifference to Defendants' civil obligations, and in fact, at times, involved criminal wrongdoing.   Defendants' conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors.   Therefore, an award of punitive damages is appropriate.   In addition, senior management of Bank of America and Citizens engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

181.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

## COUNT VI – COMMON LAW FRAUD
### (against Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner)

Plaintiffs re-allege and incorporate paragraphs 1–142 as if fully set forth herein.

182.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner participated in the preparation and dissemination of the offering materials to the Plaintiffs and the Class, which offering materials were uniformly fraudulent.

55

183.    The offering materials were delivered to all investors before each of them invested in the businesses.

184.    None of the offering materials disclosed to investors that their investments would be misappropriated, commingled, or misused.

185.    The offering materials were uniformly fraudulent in that these documents concealed and misrepresented various material facts, including, without limitation, that Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner considered themselves free to use, and did use, investor funds for purposes inconsistent with those described in the offering materials, including, but not limited to, the following: (a) the funds would go to the personal benefit of Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner; (b) investor funds would not be used to conduct business in the financial services industry; (c) investor funds would not be used for real estate development; (d) investor funds would not be used to provide loans to borrowers to buy and improve single-family homes; (e) investor funds would not be used to finance physician-owned toxicology laboratories.

186.    The offering materials were uniformly fraudulent in that these documents concealed and misrepresented material aspects of the financial structure that was conceived of and implemented by Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner for the businesses to facilitate and conceal misuse and commingling of investors' funds.  For example, the offering materials concealed or misrepresented that: (a) scores of transactions were being undertaken between bank accounts controlled by the Individual Defendants such that the investor funds were being commingled; (b) the investor funds would be misappropriated to personal accounts controlled by the Individual Defendants; and (c) the investor funds would be used to pay redeeming investors.

187.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner had actual knowledge of the omissions in the offering materials, because, among other things, they drafted, reviewed, or approved the offering materials before such were disseminated to the investors.

188.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner knew that the financial structure they created was not disclosed in the offering materials and that this financial structure was contrary to what was represented in the offering materials.

189.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner intended that investors would rely on the offering materials in investing in the businesses.

190.    Each of the Plaintiffs reviewed and relied upon the offering materials provided to him or her to invest in one or more of the businesses.  The offering materials for each business, although containing different details regarding the goals and methods of the investments, were uniformly fraudulent for the reasons stated above.

191.    Plaintiffs and the entire Class have suffered substantial injury as a result of having reviewed and relied upon the uniformly fraudulent offering materials to invest in excess of $102 million in the businesses.

192.    The specific misconduct that gives rise to this claim for common law fraud reflected a criminal indifference to the Individual Defendants' civil obligations, and in fact, at times, involved criminal wrongdoing.  The Individual Defendants' conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors.  Therefore, an award of punitive damages is appropriate.

193.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

**COUNT VII – BREACH OF FIDUCIARY DUTY**
**(against Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner)**

Plaintiffs re-allege and incorporate paragraphs 1–142 as if fully set forth herein.

194.    Because Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner held themselves out to be investment advisors, each of them owed a fiduciary duty to the investors.

195.    The fiduciary duties apply by operation of law and the terms of the investments, which state that none of the proceeds from the offerings will go to the benefit of Santillo, Parris, Siwik, Piccarreto, LaRocco, or Brenner and that they each have a "general-and-unsubordinated obligation" to the investor.

196.    Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner breached the fiduciary duties directly owed to the investors by commingling, misappropriating, and misusing the monies of Plaintiffs and the Class.

197.    Because of the breach of fiduciary duties that Santillo, Parris, Siwik, Piccarreto, LaRocco, and Brenner owed to the investors, Plaintiffs and the Class suffered damages.

198.    The specific misconduct that gives rise to this claim for breach of fiduciary duty reflected a criminal indifference to the Individual Defendants' civil obligations, and in fact, at times, involved criminal wrongdoing.  The Individual Defendants' conduct was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a willful and wanton disregard or indifference to the rights of the investors.  Therefore, an award of punitive damages is appropriate.

199.    By reason of the foregoing, Plaintiffs and the Class are entitled to a judgment awarding them compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)    Awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(3)    Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)    Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses; and

(5)    Awarding such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.

Respectfully submitted this 30th day of January, 2019.

| | |
|---|---|
| /s/*Benjamin Widlanski*<br>Benjamin Widlanski, Esq.<br>bwidlanski@kttlaw.com<br>Harley S. Tropin, Esq. (application pending)<br>hst@kttlaw.com<br>Rachel Sullivan, Esq. (application pending)<br>rs@kttlaw.com<br>Robert J. Neary, Esq. (application pending)<br>rn@kttlaw.com<br>Tal J. Lifshitz, Esq. (application pending)<br>tjl@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:   (305) 372-1800<br>Facsimile:    (305) 372-3508<br><br>*Counsel for Plaintiffs* | George Franjola, Esq. (application pending)<br>gfranjola@ocalalaw.com<br>**GILLIGAN, GOODING, FRANJOLA &**<br>**BATSEL, P.A.**<br>1531 SE 36th Ave.<br>Ocala, FL 34471<br>Telephone:    (352) 867-7707<br>Facsimile:    (352) 867-0237<br><br>*Counsel for Plaintiffs*<br><br><br>Fernando Santiago, Esq.<br>fernando@litgrp.com<br>Michael Burger, Esq.<br>mike@litgrp.com<br>**SANTIAGO BURGER LLP**<br>1250 Pittsford Victor Road<br>Bldg. 100 Suite 190<br>Pittsford, NY 14534<br>Telephone:    (585) 563-2400<br>Facsimile:    (585) 563-7526<br><br>*Counsel for Plaintiffs* |

11E5108